FREDERICK M. PENDOLEY & others *vs.* ALFRED G.
FERREIRA & another.

Essex.    December 6, 1962. — January 7, 1963.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, KIRK, & SPIEGEL, JJ.

*Piggery. Nuisance. Equity Jurisdiction,* Nuisance. *Equity Pleading and
Practice,* Injunction, Suit to enjoin nuisance.

On the facts a conclusion was warranted that offensive odors from a large
piggery conducted on a twenty-five acre parcel in a town interfered sub-
stantially and unreasonably with the enjoyment of many nearby resi-
dences and constituted a nuisance as to the owners of the residences.
[312]
In a suit in equity by residents in a newly developed and growing resi-
dential neighborhood against the proprietor of a large piggery nearby
from which, although it was well and carefully operated, offensive odors
constituting a nuisance to the plaintiffs emanated, an injunction against
operation of the piggery in such manner as to cause the odors to ema-
nate therefrom was too limited; the plaintiffs were entitled to a perma-
nent injunction against any operation of the piggery, but, having due
regard for the defendant's interests, the injunction should become effec-
tive only at a future date which would afford him a reasonable oppor-
tunity for an orderly liquidation or moving of the piggery, and the
plaintiffs should be protected in some practicable manner in the interim.
[314–315]

BILL IN EQUITY filed in the Superior Court on October 11,
1958.

The suit was heard by *Coddaire,* J., on a master's report.

*Morris J. Gordon* for the plaintiffs.

*James E. Shaw* (*Joseph A. Bachorowski* with him) for
the defendants.

CUTTER, J.    Residents of Topsfield by this bill in equity
seek to enjoin the defendants (the Ferreiras) from con-
ducting nearby in Boxford a piggery which the plaintiffs
contend constitutes a nuisance.  They also seek damages.
The case was referred to a master, whose report was con-
firmed.  The plaintiffs and the Ferreiras have appealed

from the final decree which permanently enjoined the Ferreiras "from operating their piggery . . . in such an unreasonable manner as to cause a stench to emanate therefrom which materially interferes with reasonable enjoyment of the property of a large number of people living in the vicinity, and from keeping four dogs which bark and yelp, at their piggery, unattended at night." Nine of the plaintiffs were awarded damages in amounts between $200 and $415.88, and in an aggregate amount of $2,665.88. Facts stated below are based upon the master's findings.

The plaintiffs live in Topsfield near the Boxford line, in an area varying from 250 yards to about six tenths of a mile from the Ferreiras' piggery. Their houses, "attractive and well kept up," are in the price range of $16,000 to $25,000, in "a typical, modern development of quality houses." Topsfield since 1950 has changed greatly with "the development of industry on route 128." That "rural community has become predominantly residential." In 1954, 506 houses were assessed; in 1959, about 810. At least 30 new houses have been built in Topsfield near the piggery since 1949.

The Ferreiras started the piggery in 1949 on a farm of about 25 acres. They have worked hard on it. In 1950, they had 4 to 5 employees, 400 pigs, and 100 piglets; in 1960, 10 employees, 850 pigs, and 225 piglets. Their net profit has risen from $7,219 in 1954 to $11,745 in 1959. Their investment (at cost without any allowance for depreciation of depreciable items) was land $600, structures $60,000, trucks and equipment $50,000, pigs and piglets, $50,000. There "would be very little salvage value in the structures [probably about $5,000] if the piggery had to be moved. Most of the equipment would be used in a different location with little loss." A forced sale of the pigs would result in a loss of about $20,000. The Ferreiras "are good hog farmers. Their piggery is in the upper 5% to 10% of . . . [comparable] piggeries insofar as quality of operation is concerned." The Boxford board of health felt that the Ferreiras had made an honest effort to comply with certain

recommendations made in 1957 in its behalf and was "satisfied with . . . [the] operation of the farm." The Ferreiras have not been negligent.

Prior to 1956 there were "infrequent and not particularly bothersome" odors from the piggery. Beginning in the spring of 1957, the "intensity of the odors and their frequency increased." In the plaintiffs' neighborhood, "a 'garbagy,' nauseating, obnoxious odor . . . invaded the district two or three times a week. While it did not make anyone really ill, it was extremely unpleasant. . . . Outdoor living and entertaining became subject to the vagaries of the wind . . . . Twenty to twenty-five percent of the time, during the spring, summer and fall, the residents of this area were the recipients of unwelcome odors from the piggery. . . . The odors . . . substantially lessened their enjoyment of their property." In 1958, 1959, and 1960, the intensity of the odors was less, but still "interfered materially with the [plaintiffs'] enjoyment of their property." The "typical obnoxious odors of a piggery with 850 grown garbage fed pigs have invaded . . . the newly developed high quality residential area, to the discomfort and annoyance of a large number of residents, and are of such frequency and duration as to create a truly troublesome situation," even though the "odors . . . are not unbearable or injurious to the health of a normal person." In the circumstances, the master concluded "that the stench emanating from the Ferreira piggery — despite the due care of the defendants — is a nuisance."

When the piggery was started, one of the Ferreiras went to the Boxford board of health. He was informed that "Boxford had no provisions for licensing piggeries." The master found that the Ferreiras "operated with the [board's] permission and blessing," but that the Ferreira property had not been "assigned by the board . . . as a piggery location under" G. L. c. 111, § 143 (most recently amended by St. 1956, c. 275, § 1). No public hearing has been held on such an assignment and no location assignment was noted in any record as required by § 143. Recommen-

dations, made in behalf of the board for the conduct of the piggery, "were not an 'order' from the board, but in the nature of suggestions. . . . [A]lthough the board exercised a measure of control over the operation . . . the board had no intention to . . . license it under" § 143. A gasoline storage permit granted by the selectmen to the Ferreiras was not a permit from the board of health. The master concluded that no license had been granted by the town "that would protect the . . . [Ferreiras] against the consequences of maintaining a private nuisance."

1.  The master's conclusion that a nuisance exists is consistent with common knowledge that the offensive odors of a piggery with a large number of pigs ordinarily cannot be confined to a small area, here twenty-five acres. These owners of residences within a distance to which substantial piggery odors carry are entitled to specific relief against the frequently recurrent smells which interfere substantially with the enjoyment of their property "to the discomfort and annoyance of a large number of residents." As the master pointed out, "Legally, a course of conduct that would have been without fault in . . . [a] rural area, has, with the change in the environs of the farm to a residential district, become unreasonable." See *Board of Health of Franklin* v. *Haas,* 342 Mass. 421, 424; Prosser, Torts (2d ed.) § 72, esp. at p. 415. See also *Boston Ferrule Co.* v. *Hills,* 159 Mass. 147, 150–151. In the nature of things, piggeries will be repulsive to residential neighbors (see *Commonwealth* v. *Perry,* 139 Mass. 198, 201) and such repulsiveness is sufficiently great to justify legislative authorization of the "complete prohibition of 'the employment of keeping swine.'" See the *Haas* case, *supra,* at pp. 423–424.

It can hardly be contended that damages alone will be adequate compensation for the affront to the senses of a large group of homeowners and their families from the nauseating piggery odors. In the circumstances established by the master's report, there exists a substantial, unreasonable interference with the proper enjoyment of their residences which calls for explicit injunctive relief.

See *Stevens* v. *Rockport Granite Co.* 216 Mass. 486, 491–493; *Marshall* v. *Holbrook,* 276 Mass. 341, 348; *Godard* v. *Babson-Dow Mfg. Co.* 313 Mass. 280, 286–287; *Weltshe* v. *Graf,* 323 Mass. 498, 500; *Malm* v. *Dubrey,* 325 Mass. 63, 67; *Loosian* v. *Goudreault,* 335 Mass. 253, 255; *Turner* v. *Oxford,* 338 Mass. 286, 289; *Lenari* v. *Kingston,* 342 Mass. 705, 709.[1] Cf. *Kasper* v. *H. P. Hood & Sons, Inc.* 291 Mass. 24, 28, where it was concluded, upon a "close" question, that the "annoyance to the plaintiff . . . [from early morning noise was] not . . . so serious as to be unreasonable." Cf. also *Tortorella* v. *H. Traiser & Co. Inc.* 284 Mass. 497, 502; *Senatore* v. *Blinn,* 342 Mass. 778.

The master has found that the Ferreiras will suffer a large loss if operation of the piggery is enjoined entirely. Some part of this loss can probably be avoided if reasonable time is afforded for an orderly disposition or removal of the pigs now on the premises and for finding other premises. Some structures will have little salvage value. The extent of total loss may be somewhat less than the $75,000 estimated by the master, because of his failure to make allowance for depreciation. The dollar loss to the plaintiffs is much smaller than that of the Ferreiras, but the injury affects their residences and their reasonable enjoyment of them. It, of course, is appropriate, on usual equitable principles, to take into account the damage to the Ferreiras compared to the benefit to the plaintiffs in determining the type and scope of the relief to be granted. See Restatement: Torts, § 941; Harper and James, Torts, § 1.30; Prosser, Torts (2d ed.) § 73; Pomeroy, Equity Jurisprudence (5th ed.) § 1350. This consideration, however, is not necessarily conclusive. See *Stewart* v. *Finkelstone,* 206 Mass. 28, 38; *Cumberland Corp.* v. *Metropoulos,* 241 Mass. 491, 502–503. See also *Shea* v. *National Ice Cream Co. Inc.* 280 Mass. 206, 209–211.

---

[1] For cases in other jurisdictions dealing with comparable nuisances, see annotations, 50 A. L. R. 1017 (piggeries); 17 A. L. R. 2d 1269 (rendering plants, etc.); 18 A. L. R. 2d 1033 (stockyards); 23 A. L. R. 2d 1289 (noisy advertising); 24 A. L. R. 2d 194 (dust); 47 A. L. R. 2d 490 (gravel pits, etc.); 83 A. L. R. 2d 936 (vegetation).

In considering the form and extent of the injunction, we give substantial weight to the fact that the injury to the Ferreiras is economic, whereas the material interference with the rights of the plaintiffs is in the day to day use and comfort of the places where they live.  This aspect of the case is of importance, for the plaintiffs obviously can avoid the serious unpleasantness of the piggery only by moving, an inconvenient and costly process which would deprive them of their lands and houses.  Doubtless, the diminution in the value of their properties (and any interference caused by the piggery with normal increases in market values of real estate) adds to the desire of the plaintiffs for relief. Nevertheless, their interest in having their residences comfortable and free from ''stench'' is entitled to adequate injunctive protection.

Upon the facts appearing in the master's report, the Ferreiras cannot be expected to correct the offensiveness of the piggery.  See Prosser, Torts (2d ed.) §§ 72, 73, esp. at pp. 413–414, 418.  The master has found that the piggery is very well operated.  Substantial and effective improvement can hardly be expected in such a piggery.  The Ferreiras' difficulty lies in the inherently offensive aspects of any piggery in a residential neighborhood and in the material discomfort which piggeries cause to others.  The master's report points out the changes now occurring in Topsfield and near the Boxford-Topsfield boundary.  The area, with the general expansion around Route 128, is likely to develop further.  Consequently, there is no reason to suppose that the piggery will become less detrimental to the general neighborhood or less of a nuisance.  Indeed, on the facts before us, it may be inferred that it presents an unreasonable deterrent to the normal growth of the area.

Giving due weight to all factors, the injunction granted by the final decree seems to us too limited.  In the first place, there might be difficulty in enforcing such a generally phrased injunction (cf. *Stodder* v. *Rosen Talking Mach. Co.* 247 Mass. 60, 66–68), which may not constitute an adequately ''clear and unequivocal command.''  See *Nickerson*

v. *Dowd,* 342 Mass. 462, 464; *United States Time Corp.*
v. *G. E. M. of Boston, Inc., ante,* 279, 282. Even apart
from this question, we think that the plaintiffs are entitled
to have the offensive operation terminated entirely within
a reasonable time. Due consideration, however, must be
given to the Ferreiras' economic interest in an orderly,
rather than a hurried, liquidation of their pigs, and to af-
fording them opportunity to find new premises. Accord-
ingly, a permanent injunction against any operation of the
piggery is to be granted, but the final decree is to provide
(a) a reasonable opportunity for the Ferreiras to dispose
of, or to move, the pigs, structures, and equipment, and
(b) that the injunction is to take effect completely only at a
specified future date, with provisions for the protection of
the plaintiffs in the interim in some practicable manner.
See *Chesarone* v. *Pinewood Builders, Inc., ante,* 236, 242–
243. That future date is not to be later than March 31,
1964, in any event. The period of delay should allow only
the time essential for a reasonable liquidation or adjust-
ment of the Ferreiras' affairs. The decree also may pro-
vide that the Superior Court shall retain jurisdiction to
supervise the execution of the decree. The details of the
decree are to be settled in the Superior Court after such
further hearings before the master or a judge as may be
deemed appropriate. It shall provide for the payment of
the damages hitherto awarded with any upward adjustment
necessary because of the delay in the effective date of the
injunction.

2. The subsidiary facts, summarized above, found by the
master amply justify his conclusion that no action pur-
suant to G. L. c. 111, § 143, as amended, has been taken by
the board of health of Boxford sufficient to constitute any
license to maintain this piggery. See G. L. c. 111, § 144.

3. The final decree is reversed. The case is remanded
to the Superior Court for further proceedings consistent
with this opinion.

                                            *So ordered.*